FRANCIS J. BOYLE, Chief Judge.
 

 Counterclaim plaintiff-appellants, Teresa Marie II, Inc. and Fishing Vessel Teresa Marie II (F/V Teresa Marie II), appeal from a directed verdict in favor of counterclaim defendant-appellee, Jordan-Milton Machinery, Inc. (Jordan-Milton). Appellants contend that the trial court erred in granting Jordan-Milton’s motion for directed verdict. We affirm.
 

 BACKGROUND
 

 On or about April 14 or 15, 1989, the engine of the F/V Teresa Marie II seized and required replacement. James Odlin, principal stockholder of Teresa' Marie II, Inc. contacted a salesman, Thomas Peacock, at Jordan-Milton Machinery Inc,, an authorized Caterpillar dealer, about the possibility of securing a rebuilt Caterpillar engine for the F/V Teresa Marie II. Peacock located and reported to Odlin the existence of factory rebuilt engines at prices ranging from $60,000 to $90,000.
 

 As an alternative, Peacock also told Od-lin that a new engine could be purchased for $135,000. Odlin told Peacock that he could not afford a new engine. Peacock then represented that a new engine could be financed through Caterpillar Financial Services at an interest rate of 7.9 percent.
 

 A day or two later, Peacock informed Odlin that the Caterpillar financing rate had changed from 7.9 percent to 8.25 percent. Based on the corrected rate and 100 percent financing of the engine’s cost, Peacock estimated that monthly payments would range between $3,000 and $4,000. In response Odlin asked, “Well how aggressive is Caterpillar?” Peacock responded, “Don’t worry we can do this deal.” Peacock then told Odlin that he would possibly need financial statements for the last three years. Odlin instructed Peacock to order the new engine.
 

 Shortly after ordering the engine, Odlin telephoned his bank, State Street Bank and Trust Company, requesting permission to give a mortgage to Caterpillar on the F/V Teresa Marie II as security for financing the new engine. Permission for the mortgage was granted.
 

 Engine installation began on May 1, 1989. On May 8,. 1989, Odlin met with Peacock and Peacock’s immediate supervisor, John Banks, at South Portland Shipyard where the engine was being installed. Banks, who had given approval for shipment of the engine, told Odlin at this meeting that he wanted to add an additional $9,000 from an outstanding bill to the $135,000 amount that Jordan-Milton was sending to Caterpillar Financial Services for approval. Odlin agreed to the change.
 

 On May 10, 1989, Odlin signed a blank purchase order for the new engine. Peacock, thereafter, completed the purchase order by filling in the appropriate sections. Peacock checked a box on the form marked “JM Financing”, adding the following notation:
 

 “Customer wants to finance through Caterpillar Financial. If unable to (sic) customer will finance through his own bank.”
 

 There was evidence that checking the “JM Financing” box meant that Jordan-Milton
 
 *34
 
 .would provide in-house financing or it would relay the information to others — in this case, Caterpillar Financial Services. However, Odlin did not tell Peacock that he would secure financing from his bank, nor did he authorize Peacock to add this notation to the form.
 

 On May 30, 1989, Odlin gave Peacock the financial statements for Teresa Marie II, Inc. Two days later, June 1, 1989, these statements were forwarded to Caterpillar Financial Services. Two weeks later, Caterpillar Financial Services rejected Teresa Marie II, Inc.’s application for financing because of the corporation’s poor cash flow, negative net worth and lack of equity in the F/V Teresa Marie II. Within a few days, Peacock informed Odlin of Caterpillar Financial Services’ decision.
 

 On June 23, 1989, Peacock hand delivered to Odlin the purchase order which had been signed in blank on May 10. The total cost listed on the purchase order was approximately $151,000. No demand for payment was made at that time.
 

 On August 11, 1989, Peacock hand delivered an invoice, dated June 2, 1989, to Odlin requesting a net cash payment of approximately $144,000. On August 16, 1989, Odlin received another invoice requesting a net cash payment of $135,000. Odlin did not pay any part of either invoice.
 

 Later, Jordan-Milton, as an accommodation, offered to extend financing to Teresa Marie II, Inc. at an interest rate of 12 percent. Odlin refused this offer. He insisted on financing terms identical to those which had been discussed in conjunction with Caterpillar financing.
 

 On August 13, 1990, Jordan-Milton filed a verified complaint against Teresa Marie II, Inc. and the F/V Teresa Marie II, seeking payment for the engine. The F/V Teresa Marie II was seized and sold at a United States Marshal’s sale to State Street Bank and Trust Co. for $375,000. The sale was confirmed by the United States District Court, District of Maine on November 27, 1990. Both Teresa Marie II, Inc. and F/V Teresa Marie II filed counterclaims alleging breach of contract, fraudulent and negligent misrepresentation, and breach of an implied covenant of good faith and fair dealing.
 

 At the close of the counterclaim plaintiffs’, Teresa Marie II, Inc. and F/V Teresa Marie II, case, the trial court directed a verdict in favor of Jordan-Milton. The court ruled that there was no agreement which required Jordan-Milton to provide financing. Because there was no agreement, the court held that there was no basis for a claim of breach of an implied covenant of good faith and fair dealing. Finally, the court found that there was no evidence of fraudulent or negligent misrepresentation. Teresa Marie II, Inc. and F/V Teresa Marie II appeal.
 

 II. STANDARD OF REVIEW
 

 Appellate review of a motion for directed verdict
 
 [1]
 
 is
 
 de novo. Biggins v. Hazen Paper Co.,
 
 953 F.2d 1405, 1409 (1st Cir.1992). A directed verdict is proper when the evidence leads to but one conclusion.
 
 Richmond Steel v. Puerto Rican Am. Ins.,
 
 954 F.2d 19, 22 (1st Cir.1992). The evidence and all reasonable inferences which may be drawn therefrom must be construed in the light most favorable to the nonmoving party.
 
 Id.
 
 The trial court is not free to make credibility determinations or to weigh the evidence.
 
 Veranda Beach Club v. Western Sur. Co.,
 
 936 F.2d 1364, 1383-84 (1st Cir.1991).
 

 III. BREACH OF CONTRACT
 

 The trial court determined that there was no agreement requiring Jordan-Milton to provide Teresa Marie II, Inc. with financing. We agree.
 

 First, the parties do not dispute that there was a contract between Jordan-Milton and Teresa Marie II, Inc. for the sale of the engine. The question is whether there
 
 *35
 
 was also an agreement for financing the purchase price of the new engine.
 

 Odlin and Peacock had several conversations regarding financing. All of these conversations concerned the purchase of the engine and all involved Caterpillar financing. At trial, Odlin testified as follows:
 

 ... so then he [Peacock] came in and he said, 'Look, let me look into a new one, a 3509.’ I said, T don’t have any money to pay for a new one____ I can’t afford a new engine.’ He said, ‘Well, we can do financing at 7.9% rate’ ... and I said ‘Well, you know, if you can do that, look into it’ 'It was either that day or the next day he [Peacock] came back to the office and his deal was he had located an engine Southworth Machinery. He quoted me a. price of $135,000 with the gear ...... You know it isn’t 7.9% financing, Jim. I was wrong. They have changed that program. It’s 8.25 percent financ-ing____ Local banks are 13 percent. See what a great deal this is.’ [A]nd I said, ‘Yes, that’s great.’ He quoted me the payments, originally, of like $2755 up through $4000, and again I had told him the day before I can’t afford a new engine. We don’t have the cash. He stated that the payments would be in the $4000 range. I said, ‘Well, how aggressive is Caterpillar?’ Because I didn’t want to have a problem. He said, ‘Don’t worry. We can do this deal.’ I specifically said, ‘How aggressive are they?’ He said, ‘We can do the deal.’ Based on that, I said, ‘Let’s do the deal.’ I shook his hand and said, ‘Order the new engine’ and I left it at that. ... I called the State Street Bank, and I said, ‘Mr. Morse, I have got Caterpillar here ready to finance an engine. I have got to be able to put a mortgage on it. Can I have your permission?’ He gave me that permission prior to the engine being installed.
 

 It is clear from Odlin’s testimony that there was no mention of financing by Jordan-Milton or any other financial institution, and that he anticipated Caterpillar financing to be forthcoming. Caterpillar, however, did not give Odlin any assurance that it would provide financing for the new engine. Odlin simply hoped that Caterpillar financing would come through. Plaintiffs argue, however, that sufficient assurances of financing were provided by Jordan-Milton’s conduct of ordering and causing the engine to be shipped, knowing that financing was a necessary part of the sale.
 

 This argument, however, has no basis given the uncontested evidence that Odlin in his course of dealing with Jordan-Milton through Peacock had in the past received a Caterpillar engine from Jordan-Milton before financing had been approved. On that occasion, Odlin was notified some four months after receipt and installation of the engine that Caterpillar had approved financing. Given Odlin’s course of dealing with Jordan-Milton, he knew or indeed should have known that mere shipment of the engine did not mean that financing had been or would be approved.
 

 Second, even if Peacock’s statement, “We can do this deal,” could be construed as creating an agreement to provide financing, this agreement would be unenforceable as being too vague and uncertain to constitute an enforceable contract.
 
 See Ault v. Pakulski,
 
 520 A.2d 703, 804 (Me. 1987) (agreement must be sufficiently definite in order to be binding);
 
 see also
 
 Restatement (Second) of Contracts § 33 (1981) (contract terms must be reasonably certain so as to enable a court to establish the existence of a breach and fashion a remedy therefrom). There was not any agreement as to the term of the loan (i.e., when repayment was to begin and end); there was no agreement as to the amount to be repaid each month; nor was there an agreement as to the rate of interest to be charged by a lender other than Caterpillar Financial Services. These omitted terms are material to a determination of whether an agreement for financing existed. Absent these key terms, there was not a valid enforceable agreement to provide financing.
 

 Finally, even if an agreement to provide financing could be found, Peacock, in his capacity as a salesman, had no authority to bind either Caterpillar Financial
 
 *36
 
 Services or Jordan-Milton to an agreement to finance the purchase of the engine. An employee of a corporation who lacks the proper authority cannot enter into binding obligations on the corporation’s behalf.
 
 Libby v. Concord General Mut. Ins. Co.,
 
 452 A.2d 979, 981 (Me.1982) (citing
 
 Stevens v. Frost,
 
 140 Me. 1, 32 A.2d 164, 168 (1943)); Restatement (Second) Agency § 25 (1958). There is no evidence in the record to support a suggestion that Peacock had either actual or apparent authority to bind either Jordan-Milton or Caterpillar Financial Services to finance the purchase of the engine.
 

 The district court was correct in its finding that no contract for financing existed. Absent a contract for financing, there is no need to discuss the counterclaim plaintiffs’ claim of breach of an implied covenant of good faith and fair dealing since absent a contractual responsibility this duty does not arise.
 
 See Reid v. Key Bank of Southern Maine, Inc.,
 
 821 F.2d 9, 12 (1st Cir. 1987).
 

 IV. NEGLIGENT MISREPRESENTATION
 

 The Maine Supreme Court has adopted the theory of negligent misrepresentation as defined by the Restatement (Second) of Torts § 552(1) (1977). Negligent misrepresentation results where
 

 [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 

 Chapman v. Rideout,
 
 568 A.2d 829, 830 (Me.1990) (citing Restatement (Second) of Torts § 552(1) (1977));
 
 see also Diversified Foods, Inc. v. First Nat. Bank of Boston,
 
 605 A.2d 609, 615 (Me.1992).
 

 In
 
 Chapman v. Rideout,
 
 568 A.2d 829 (Me.1990), the Maine Supreme Court found the defendant liable for negligent misrepresentation.
 
 Chapman
 
 involved the sale of land. The Defendant, seller, marked the boundaries of the land without first surveying the property. He subsequently sold the land to the buyer, telling him that the boundaries were • as marked. The buyer relied upon the seller’s representation and began building on the land. Later the buyer learned .that the seller had incorrectly represented the boundaries. The buyer sued and the seller was held liable for negligent misrepresentation.
 

 Here, counterclaim plaintiffs claim that Peacock made false statements when he made the following representations to Od-lin:
 

 “The [monthly] payments would be in the $4,000.00 range”
 

 “Don’t worry, we can do this deal.” “Local banks are 13%. See what a great deal this is.”
 

 “The terms of the financing was 8.25% with 100% financing”
 

 Plaintiffs claim that Odlin justifiably relied on these statements, and, thus, Jordan-Milton is liable under the theory of negligent misrepresentation. Plaintiffs’ claim fails for two reasons.
 

 First, there was a total lack of evidence to prove that these statements were false at the time they were made. It was not until Odlin furnished his financial information to Caterpillar that Caterpillar refused to provide financing. Second, counterclaim plaintiffs could not have justifiably relied on Peacock’s statements with respect to promised financing because Odlin through his course of dealing with Jordan-Milton knew or should have known that approval of Caterpillar financing came directly from Caterpillar and not Jordan-Milton employees. Odlin testified that he had said to Peacock at the very beginning of their relationship, “Well, how aggressive is Caterpillar?” He also most certainly knew that Peacock did not work for Caterpillar. Furthermore, Odlin testified that “[w]hen Mr. Peacock and I cut the first deal, when we cut the deal, he said, T am possibly going to need three year’s (sic) financial statements.’ I said, ‘[t]hat’s not a problem. I don’t have them here now. We are having
 
 *37
 
 our financial stuff brought up to date.’ ... He didn’t say ‘possibly.’ And so we left it at that.” Peacock’s reference to three years’ financial statements surely suggested that the satisfactoriness of Od-lin’s financial condition would be germane to the question of his obtaining financing from Caterpillar or whoever else — otherwise the statements would be meaningless. And, as Odlin’s later testimony revealed, Odlin was well aware that his financial condition was precarious and his credit rating virtually zero:
 

 Q Did you ever at any time have a conversation with Mr. Peacock indicating that you would be able to go to your own bank?
 

 A No, I did not.
 

 Q Did you at any time ever tell Mr. Peacock that you had alternative financing available to you?
 

 A No, I did not.
 

 Q Did you have any financing available to you?
 

 A No, not at that time.
 

 Q Did you seek any additional financing?
 

 A No, I didn’t.
 

 Q Why not?
 

 A I knew I eouldn’t get it.
 

 Q Why?
 

 A The fishing had been bad for a year or two and, you know, I knew my situation with State Street Bank. A lot of banks in New England weren’t lending money anyway to anybody let alone in the fishing industry with all the press we were getting that was bad, you know, we had been a little late on a couple of our payments and were struggling at the time.
 

 It would have been unreasonable for Od-lin, in such circumstances, to construe Peacock’s puffery about “doing the deal” as concrete information that Caterpillar financing was a certainty — and to rely upon such a construction, if indeed he did so. There could have been no “justifiable reliance” on the vague exhortation provided.
 

 V. CONCLUSION
 

 Counterclaim plaintiffs’ claims for relief based on promissory estoppel, fraudulent misrepresentation, wrongful arrest, and malicious arrest will not be considered because these issues have neither been briefed nor argued.
 
 See United States v. Zannino,
 
 895 F.2d 1, 17 (1st Cir.1990).
 

 In conclusion, there was no evidence from which a jury could have reasonably determined that a contract for financing existed between Jordan-Milton or Caterpillar Financial Services and Teresa Marie II, Inc., nor was there sufficient evidence from which a jury could have found Jordan-Milton liable for negligent misrepresentation. The district court did not err in granting Jordan-Milton’s motion for directed verdict.
 

 The judgment of the district court is
 
 affirmed.
 

 [1]
 

 . Because of a recent amendment to Fed. R.Civ.P. 50(b) a "motion for directed verdict" is now referred to as a "motion for judgement as a matter of law.”
 
 See Federal Civil Judicial Procedure and Rules
 
 139 (West Pub.Co. rev. ed. 1991). Of course a change of name does not change the substance. The same legal standard will continue to be applied.