# United States Court of Appeals
## For the First Circuit

No. 13-2035

PACKGEN,

Plaintiff, Appellant,

v.

BP EXPLORATION & PRODUCTION, INC., and
BP AMERICA PRODUCTION COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter,* Associate Justice,
and Stahl, Circuit Judge.

Michael R. Bosse, with whom Travis M. Brennan, George F. Burns, and Bernstein Shur were on brief, for Appellant.
Christina Briesacher, with whom David J. Volkin, Amy Cashore Mariani, Kirkland & Ellis LLP, and Fitzhugh & Mariani LLP were on brief, for Appellees.

June 11, 2014

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL, Circuit Judge**.  In the aftermath of the Deepwater Horizon oil spill of 2010, Appellant Packgen, a manufacturer of packaging products, sought to sell oil containment boom to Appellees BP Exploration & Production, Inc. and BP America Production Company (collectively, "BP").  Despite months of negotiations, BP ultimately decided not to purchase any boom from Packgen.  Packgen subsequently filed a five-count complaint in the federal district court in Maine, invoking diversity jurisdiction and alleging various state-law tort claims.  The district court granted summary judgment in favor of BP.  For the following reasons, we affirm.

## I.  BACKGROUND

The district court's summary judgment order sets forth the facts of this case in meticulous detail.  Packgen v. BP Exploration & Prod., Inc., 957 F. Supp. 2d 58, 63–82 (D. Me. 2013).  We reiterate them here as necessary to provide context for the issues on appeal, but we note that many of the facts are based solely on Packgen's own testimony.  While the district court accepted these facts as true for the purposes of the summary judgment motion, see Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam) ("[O]n a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") (internal quotation marks and alternation omitted), in many instances BP disputed Packgen's

version of events. The district court's order thoroughly documents the points of dispute, and clarifies that it accepted Packgen's version of the facts in every instance. Packgen, 957 F. Supp. 2d at 64-83 nn.1-81.

On April 20, 2010, an oil drilling rig owned by BP named Deepwater Horizon caught fire and sank off the Gulf Coast of Louisiana, causing a massive oil spill. Part of BP's response involved the deployment of oil containment boom. It had an immediate need for millions of feet of boom, but it encountered problems with availability, production, and interconnectivity.

Packgen is a small business in Maine that designs and manufactures composite packaging materials and containers used in the chemical, oil, and food-processing industries. Prior to the Deepwater Horizon spill, Packgen had never manufactured oil containment boom. Nevertheless, it saw an opportunity to make boom part of its business in the wake of the spill, and it began constructing boom manufacturing equipment no later than April 28, 2010, prior to any discussions with BP.

By early May 2010, Dan Forte, a marketing consultant for Packgen, spoke to Mario Araya, who was procuring boom for BP. Araya made an oral commitment to Forte to purchase all of Packgen's present and future production of boom for $21.75 per square foot, subject to a visit by BP personnel to inspect Packgen's facility and boom capacity. On May 11, 2010, Max Lyoen, a Supplier Quality

Control Specialist for BP, inspected Packgen's facility and met with several Packgen representatives, including Forte, John Lapoint, and Don Roberts. Lyoen was impressed by Packgen's production capacity, and he stated that the end connectors used by Packgen would meet BP's requirements.

At that time, the American Society for Testing and Materials (ASTM) standards were the only specifications that BP had for boom. Lyoen told Packgen's representatives that BP would purchase Packgen's full production capacity once an independent third party tested Packgen's boom for compliance with the ASTM standards. After that meeting, Lapoint wrote an email to a colleague stating that "[we] should have a response by tomorrow morning on how much [BP] will commit. . . . [W]e are just waiting on BP to make their decision. . . ."

On May 12, 2010, Forte and Araya spoke by phone, and Araya stated "I'm placing an order. We'll take it all." The next day, Araya negotiated the price down to $18.75 per square foot and told Forte that BP would not pay up front. In response, Forte sent Araya an email thanking him for "discussing the details of a possible transaction." He stated that the companies "may be able to address the issues concerning payment terms and pricing. What remains is the issue concerning the acceptability [of] our design and the requirements you have stated. . . . All that we require is

a letter from Max Lyoen stating that the design meets your requirements."

On May 13, 2010, Packgen informed BP that it was "moving forward" with the sale and delivery. At that point, it began gearing up its operations to produce 40,000 linear feet of boom per day. On May 18, 2010, Forte sent an email to Matt Pavlas, BP's boom sourcing lead, stating that Packgen was "attempting sales to BP and Oil Cleanup companies." He informed Pavlas that Lyoen had visited Packgen's facilities and written a report for BP; he asked Pavlas to "provide indications if this report meets BP requirements." Pavlas provided Packgen with a copy of Lyoen's report, which described Packgen's product as "experimental."

Packgen hired Dr. Ian Durham to conduct third-party testing. On May 20, 2010, Dr. Durham reported that Packgen's boom met ASTM standards. Packgen provided Lyoen and two BP procurement managers with the test results. On May 22, 2010, Don Roberts of Packgen sent Pavlas an email expressing his "hope [that] the information from the third party review helps in the decision making process." Pavlas contacted Roberts by phone and stated that BP intended to purchase Packgen's entire stock of boom. Roberts followed up in an email on May 24, 2010, asking Pavlas for a conference call "to discuss [our] possible working relationship." Pavlas responded that "first I would like to receive the

information requested yesterday such as [quantity] in inventory, etc."

On May 26, 2010, Deenan Arcot of BP emailed Roberts requesting the specifications for Packgen's boom, which he said BP would have to approve prior to placing an order. After receiving the specifications, Arcot expressed reservations about the construction of the boom in an email to Roberts, observing that it was "[v]ery different . . . from others being used." In a follow-up email, Arcot wrote "I want to check the possibility that you can modify these booms to our standard requirement." Roberts later testified that this was the first time BP ever expressed having any standard requirement for boom other than the ASTM standards.

On May 26, 2010, BP noted potential problems with the connector plates and end connectors on Packgen's boom and informed Packgen that it could not use the product at that time. Lapoint and Roberts spoke to BP's Charles Bigi about the connector issue, and Bigi promised that BP would approve and buy Packgen's boom if Packgen obtained new universal connectors. On May 29, Bigi sent two colleagues at BP an email summarizing his discussions with Packgen and including the statement "I do not understand why we keep placing orders with suppliers like this[.]"

In late May or early June, Packgen secured universal slide connectors. On June 11, 2010, BP sent Luis Suarez, a Supplier Quality Control Specialist, to conduct an assessment of

Packgen's manufacturing process.  Following his visit, Suarez told Lapoint and Roberts that BP would purchase Packgen's full capacity. On June 15, 2010, Suarez requested that Packgen send 500-600 feet of boom for evaluation by BP.  He issued a report the following day in which he proposed three new modifications that he had not previously discussed with Packgen.

Meanwhile, BP's demand for boom continued to increase. It began to institute a new approval process for boom manufacturers and hired technical authorities on boom.  As of June 18, 2010, BP had completed a written specification for 18" boom.  Thereafter, it began requesting that boom manufacturers complete a deviation form if their boom differed from the specification.  Packgen's boom design was so different from BP's specification that Packgen agreed to submit a drawing of its boom instead of the deviation form. Between June 16 to June 25, 2010, BP requested numerous changes from Packgen, none of which were required by the ASTM standards. Packgen worked at BP's direction to make the necessary changes.

On June 21, 2010, Suarez reiterated his request for a sample of boom to conduct field tests.  BP conducted its first field test on June 30, 2010, at a BP site near Mobile, Alabama. Packgen's boom did not perform well.  At that time, BP raised two new concerns about Packgen's boom — first, it was constructed with material that filled with water as it was towed, and second, it

failed to meet certain decontamination standards.  Packgen worked to address the two new concerns.

While they were in Alabama, Bigi informed Roberts that BP needed 24" boom and suggested that Packgen could be BP's supplier for that product if it could adapt its manufacturing process.  On July 7, 2010, Suarez forwarded the latest specification for 24" boom to Packgen.  BP's John McFadden asked Packgen to "work on getting the material to make 24" boom."  At BP's direction, Packgen completed a field test of the new boom on July 12, 2010, and forwarded a video tape of the test to BP.

BP capped the Deepwater Horizon well on July 15, 2010, and shortly thereafter began winding down its boom purchases. Nevertheless, it conducted another field test of Packgen's boom on July 21, 2010.  BP's summary of the results show that the boom performed well.  Following the field test, McFadden gave verbal approval to Packgen's boom.  Suarez informed Packgen that it was one of just three approved suppliers for 24" boom and that BP would need boom to continue cleanup efforts through the end of 2010.

At no point did BP tell Packgen to stop producing boom, and it never paid for any of the boom Packgen produced.  On August 18, 2010, Roberts emailed BP expressing the understanding that "there is not a need right now for [b]oom" but seeking a place on BP's approved vendor list.  BP responded that Packgen had been added to the approved vendor list for boom.

Packgen was left with 60,000 feet of completed boom in its warehouse, which it sold in September 2010 to the only purchaser it could find for two dollars a square foot. Although Packgen was unable to sell or return many of the materials that it purchased to manufacture boom, it managed to sell some at a loss and incorporate some into its other products. Since the resolution of the Gulf Coast spill, Packgen has not manufactured boom.

## II. ANALYSIS

"We review orders for summary judgment de novo, assessing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Barclays Bank PLC v. Poynter, 710 F.3d 16, 19 (1st Cir. 2013) (internal quotation marks omitted). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.    Misrepresentation (Counts I & II)

In Counts I and II, Packgen alleged negligent and intentional misrepresentation. While negligent and intentional misrepresentation are distinct claims, both require the plaintiff to show that the defendant made a "false representation of present fact." Kearney v. J.P. King Auction Co., 265 F.3d 27, 33 n.8 (1st Cir. 2001); see also Guiggey v. Bombardier, 615 A.2d 1169, 1173

(Me. 1992) ("A common, essential element of both claims is the requirement of a false representation.").

As the district court observed, Packgen bases these two claims on three groups or categories of misrepresentations: "(1) what, at a particular point in time in the oil spill saga, BP required for its specification, (2) its intention to purchase Packgen's boom, and (3) how much boom it needed at any particular time."  Packgen, 957 F. Supp. 2d at 86. The district court concluded that both claims fail as a matter of law because there is no evidence in the record that any of the alleged misrepresentations were false at the time they were made.[1]  Id. at 86–88.  We agree.  See Jordan-Milton Mach., Inc. v. F/V Teresa Marie, II, 978 F.2d 32, 36 (1st Cir. 1992) (affirming a directed verdict in favor of the defendant on a negligent misrepresentation claim where "there was a total lack of evidence to prove that [the defendant's] statements were false at the time they were made").

Packgen argues on appeal that the district court improperly weighed the evidence in BP's favor while overlooking reasonable inferences that the jury could have drawn in Packgen's

---

[1] The district court also discussed the possible application of the so-called Shine exception, which allows statements of opinion to be actionable as misrepresentations under certain circumstances. Packgen, 957 F. Supp. 2d at 85–86; Shine v. Dodge, 157 A. 318, 319 (Me. 1931).  Because we conclude, along with the district court, that the evidence does not show the alleged misrepresentations to be false, we do not need to delve into the Shine exception.

favor.   None of the possible inferences raised by Packgen controvert the fundamental deficiency identified by the district court, however, because Packgen still does not identify specific evidence in the record showing that any of BP's statements were false at the time they were made.  A party cannot survive summary judgment simply by articulating conclusions the jury might imaginably reach; it must point to evidence that would support those conclusions.   See Miss. Pub. Emps.' Ret. Sys. v. Bos. Scientific Corp., 649 F.3d 5, 28 (1st Cir. 2011) ("With respect to each issue on which [a] plaintiff has the burden of proof at trial, it must present definite, competent evidence to rebut the motion . . . .") (internal quotation marks omitted).

For example, Packgen posits that "a jury could reasonably conclude that BP kept making changes to its specification during the spill so that manufacturers would continue to work for BP, acceding to different requests made by BP at different times, without BP actually having to pay for the boom." [Appellant Br. at 42-43.]  If a jury reached that conclusion, it would be pure speculation.  The evidence shows that BP's boom specifications changed repeatedly during its course of dealing with Packgen, but nothing in the record indicates that these changes reflect the bad intentions that Packgen describes.  Similarly, nothing in the record indicates that BP expressed an intention to purchase boom

-11-

when it actually had no such intention, or that it ever claimed to need more boom than it really needed.

Thus, the district court did not impermissibly weigh evidence or ignore reasonable inferences. Rather, it pointed out the absence of evidence supporting Packgen's position. Its reasoning and conclusions were correct, and we affirm its judgment as to Counts I and II.

**B.        Breach of Contract (Count III)**

Under the Maine Statute of Frauds, a contract for the sale of goods for five hundred dollars or more is unenforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent." Me. Rev. Stat. tit. 11, § 2-201(1). Packgen does not claim that there is any written agreement in this case that would satisfy the Statute of Frauds. Instead, it argues for the application of two statutory exceptions: the "specially manufactured goods" exception and the "judicial admission" exception. The district court held that neither applies, and we agree.

**1.        Specially Manufactured Goods Exception**

The Maine statute creates an exception to the requirement of a written agreement "[i]f the goods are to be specially manufactured for the buyer and are not suitable for sale to others

-12-

in the ordinary course of the seller's business."  § 2-201(3)(a).
The applicability of the exception depends on whether the goods
themselves have unique qualities that render them unfit for sale
without major alterations to anyone other than the intended buyer.

> The term 'specially manufactured' . . . refers to the
> nature of the particular goods in question and not to
> whether the goods were made in an unusual, as opposed to
> the regular, business operation or manufacturing process
> of the seller. . . . The crucial inquiry is whether the
> manufacturer could sell the goods in the ordinary course
> of his business to someone other than the original buyer.
> If with slight alterations the goods could be so sold,
> then they are not specially manufactured; if, however,
> essential changes are necessary to render the goods
> marketable by the seller to others, then the exception
> does apply.

9 Williston on Contracts § 26.19 (4th ed.) (quoting Impossible
Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc., 669 F.2d
1026, 1037 (Former 5th Cir. 1982)) (internal quotation marks
omitted).

Here, as the district court observed, after BP declined
to buy its boom, Packgen was able to sell it to another buyer
without any alterations.  It is true the Packgen received a greatly
reduced price than what BP appeared prepared to pay, but the
undisputed facts show that the price reduction was caused by an
overabundance of boom in the market following the capping of the
leak.  Under these circumstances, the exception does not apply.

Packgen's arguments on appeal do not persuade us
otherwise.  Rather than pointing to any unique qualities of its
product, Packgen argues that the circumstances surrounding its

production and sale of boom indicate that its product was specially manufactured for BP. It points to the fact that BP was purchasing ninety percent of domestic boom production in the aftermath of the spill, and that Packgen only decided to enter the boom market in response to the disaster. These arguments are beside the point. It is the nature of the goods themselves that matters, not the circumstances under which Packgen tried to do business with BP.

Packgen also argues that it did not sell boom in its ordinary course of business, because it never sold boom before the spill and it has not sold boom since. This argument ignores the fact that Packgen independently entered the market for boom and attempted to sell its product to BP; it did not make that decision at BP's request. As BP accurately points out, "under Packgen's analysis, any company [that] attempts to break into any business could claim a contract for specially manufactured goods when its attempt fails and it liquidates its inventory." [Appellee's Br. 18] This exception does not exist as a safety net for failed business ventures. Instead, it protects sellers who might be stuck with "goods that are difficult or impossible to sell to others" because of their unique nature. 9 Williston on Contracts § 26.19. That is not Packgen's position in this case. Thus, the district court correctly declined to apply the "specially made goods" exception.

## 2.    Judicial Admission Exception

The Statute also creates an exception "[i]f the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made." § 2-201(3)(b).  The admission "need not expressly acknowledge the existence of a contract," but it must "describe conduct or circumstances from which the trier of fact can infer a contract." Gruen Indus., Inc. v. Biller, 608 F.2d 274, 278 (7th Cir. 1979). Packgen offers two bases for the application of this exception. First, Packgen points to deposition testimony in which Charles Bigi authenticated an email that he sent to colleagues at BP, supposedly referring to an order BP placed with Packgen.  Second, it points out that BP failed to provide record citations when it denied certain statements in Packgen's statement of material facts. Packgen argues that under Federal Rule of Civil Procedure 56, the failure to provide record citations constitutes admissions that satisfy the exception.

### a.   Charles Bigi's Email

In the email that Packgen puts forth as an admission, Charles Bigi wrote to his colleague, "I do not understand why we keep placing orders with suppliers like this[.]"  The district court concluded that "viewing the statement in the context of the rest of the undisputed evidence, and viewing the entire record in the light most favorable to Packgen, Mr. Bigi's email does not

support" an inference that a contract existed between BP and Packgen. Packgen, 957 F. Supp. 2d at 93. Packgen argues that the district court "invaded the jury's province by impermissibly weigh[ing] conflicting evidence" when it reviewed the record to assess the significance of Bigi's email. [Appellant's Br. 25] We disagree. In order to accurately determine whether a jury might infer a contract from Bigi's email, the district court had to look at the statement in the context of the ongoing communications between BP and Packgen.

In Gruen, the Seventh Circuit engaged in a similar analysis. In that case, the plaintiff argued that an agent of the defendant made statements in a deposition describing conduct from which a jury could infer the existence of a contract. 608 F.2d at 278–80. The court concluded that a "reading of the transcript of these statements, however, shows nothing more than ongoing negotiations, because the conduct was accompanied by statements making it clear that there was no agreement until the negotiations were complete." Id. at 279–80 (footnote omitted).

Here, the district court reviewed the communications between Packgen and BP that led up to Bigi's email and concluded that the evidence did not support an inference that a binding agreement existed at that time. We do not need to walk through the district court's review of the record step by step, but we highlight one key point. On May 24, 2010, just a few days before

Bigi's email, Packgen requested a conference call with BP to "discuss [our] possible working relationship." That statement is an unambiguous indication that Packgen itself did not believe it had a binding agreement with BP as of that date. Nothing in the record indicates that a deal occurred between May 24 and 29; to the contrary, on May 26, BP stated that it would have to approve Packgen's specifications before placing an order.

Thus, it was appropriate for the district court to wonder "to what order does [Bigi's] email supposedly refer?" Packgen, 957 F. Supp. 2d at 93. The record of Packgen's own statements prior to Bigi's email consistently points to ongoing negotiations between the parties rather than a binding agreement. Moreover, Bigi testified in his deposition that he had no knowledge of any orders that Packgen had from BP, and that he would not have "been part of any contracts or commercial agreements." [App. 967–69] In light of the record as a whole, we agree with the district court's conclusion that Bigi's email is not an admission for the purposes of the Statute of Frauds.

b.   Denials Unsupported By Record Citations

Packgen also argues that the district court should have deemed certain portions of its statement of material facts admitted, because BP failed to properly controvert them with citations to the record in violation of Federal Rule of Civil Procedure 56. Packgen, 957 F. Supp. 2d at 94–95 & n.84. According

to Packgen, if the district court had admitted its statements as uncontroverted, they would satisfy the judicial admission exception to the Statute of Frauds.

Packgen's argument proceeds as though the admission of uncontroverted statements of fact is an iron-clad rule. That position does not comport with our case law. In Cabán Hernández v. Philip Morris USA, Inc., we explained that "in the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." 486 F.3d 1, 7 (1st Cir. 2007). In other words, a party's failure to comply with the formal requirements of Rule 56 does not trigger a mechanical response from the district court. Instead, the district court acts within its discretion to respond in a manner appropriate to the circumstances of the case. This approach is consistent with the language in the District of Maine Local Rule 56(f), which provides that the court "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. Me. Loc. R. 56(f) (emphasis added).

Here, the district court did not abuse its discretion. It observed that BP "has consistently denied that it entered into an oral agreement, and has supported its denial with the sworn statements of [its] employees." Packgen, 957 F. Supp. 2d at 95.

-18-

Further, it noted that Packgen had not managed in the course of discovery "to establish a BP admission that would qualify under the judicial admission exception. Instead, it posited assertions of its own employees as statements of material fact and attempted to place the onus on BP not only to deny them, but also to proffer evidence justifying the denial." Id. It concluded that "[i]n these unusual circumstances, the Court holds Packgen to what Packgen itself found during discovery." Id. We find these reasons more than adequate to justify the district court's decision not to deem Packgen's statements admitted for the purpose of the exception.

In sum, the district court did not err in deciding that neither exception to the Statute of Frauds applies. We affirm its entry of judgment in favor of BP on Count III.

## C.    Equitable Relief (Count IV)

In Count IV, Packgen sought equitable relief under theories of unjust enrichment and quantum meruit.[2] The district court, relying on Paffhausen v. Balano, 708 A.2d 269 (Me. 1998), distinguished the two theories: "Quantum meruit . . . involves

---

[2]   The caption to Count IV also includes "Restitution," but restitution in this context is a type of remedy, not a cause of action separate and distinct from unjust enrichment. See Restatement (Third) of Restitution & Unjust Enrichment § 1 (2011) ("A person who is unjustly enriched at the expense of another is subject to liability in restitution."); Goodwin v. C.N.J., Inc., 436 F.3d 44, 50 (1st Cir. 2006) ("Restitution is a remedy associated with the concept of unjust enrichment."). Therefore the district court correctly declined to analyze it separately.

-19-

recovery for services or materials provided under an implied contract. Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship." Packgen, 957 F. Supp. 2d at 96 (quoting Paffhausen, 708 A.2d at 271). To prevail on an unjust enrichment claim under Maine law, a plaintiff must show that "(1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." Id. (quoting Platz Assocs. v. Finley, 973 A.2d 743, 750 (Me. 2009)) (internal quotation mark omitted). A quantum meruit claim requires proof "that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." Id. (quoting Paffhausen, 708 A.2d at 271) (internal quotation mark omitted). The district court correctly concluded that Packgen cannot prevail under either theory.

### 1.    Unjust Enrichment

Packgen argued before the district court that it provided technical information that BP used to develop its boom specification. It urged the district court to follow APG, Inc. v. MCI Telecommunications Corp., 436 F.3d 294 (1st Cir. 2006), in which this court allowed an unjust enrichment claim to survive

-20-

summary judgment where the plaintiff acted as a middleman in the sale of prepaid telephone cards between the defendant and a third party. The defendant in APG ultimately dealt directly with the third party, cutting the plaintiff out of the deal. The court held that there was sufficient evidence to raise a question of fact regarding whether the time and effort expended by the plaintiff to secure the deal constituted a benefit for the defendant. Id. at 305-06.

The district court decided that this case is less analogous to APG than to Forrest Associates v. Passamaquoddy Tribe, 760 A.2d 1041 (Me. 2000). In Forrest Associates, the plaintiff was a management consulting firm that provided the defendant with a market assessment and proposal related to a bingo operation. The Supreme Judicial Court of Maine vacated a judgment in the plaintiff's favor on its unjust enrichment claim. It held that "the evidence in the record fails to establish that Forrest conferred a benefit on the Tribe. Although Forrest created the comprehensive plan and presented it to the Tribe, there is no evidence that the Tribe benefitted from either the presentation or the information contained in the plan." Forrest Assocs., 760 A.2d at 1046. We agree with the district court that the same conclusion applies here.

On appeal, Packgen repeats its argument that BP used information provided by Packgen "to develop a general specification

for boom and to realize cost savings." It fails, however, to cite any evidence in the record supporting that statement, and our own review of the record has not uncovered any. The record shows that Packgen provided information about its boom design to BP, but nothing indicates that BP used the information in any way for its own benefit. Therefore, we affirm the district court's judgment in favor of BP on the unjust enrichment claim.

### 2. Quantum Meruit

Packgen fares no better under a theory of quantum meruit. In Paffausen, the Supreme Judicial Court of Maine explained that a successful quantum meruit claim requires "proof that services were rendered under circumstances consistent with contract relations. It must appear that the one who rendered the services expected compensation and that the one who received or benefitted from the services so understood, and by her words or conduct justified the expectation." 708 A.2d at 272 (citation and internal quotation marks omitted).

In this case, it is not apparent what "services" Packgen provided that might be the basis for a quantum meruit claim. It took steps to test and modify its product and provide BP with information in an effort to complete a sale. We do not think that type of activity is a "service" in the ordinary sense of the word. But even setting that point aside, there is nothing in the record that suggests either party expected BP to compensate Packgen for

anything other than the product itself. In other words, the negotiations between the parties here were for a sale of goods, not the provision of services. In the absence of any expectation of payment for services rendered, the quantum meruit claim must fail.

**D.        Promissory Estoppel (Count V)**

Packgen's final claim is for equitable relief under a theory of promissory estoppel. Maine courts have adopted the definition of promissory estoppel in the Restatement (Second) of Contracts, which states that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90(1); see Harvey v. Dow, 962 A.2d 322, 325 (Me. 2008). The parties dispute whether under Maine law the doctrine applies to a promise that is otherwise unenforceable under the Statute of Frauds.

Maine courts have not definitively settled this question. In some cases, they have relied on Section 139 of the Restatement, which provides that promissory estoppel may apply "notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 139(1). Thus, in Chapman v. Bomann, the Supreme Judicial Court of Maine allowed a promissory estoppel claim to go forward seeking

-23-

enforcement of an oral promise to sign a contract for the sale of real estate, despite the fact that the unsigned contract was itself unenforceable under the Statute of Frauds. 381 A.2d 1123, 1129 (Me. 1978). But in the context of employment contracts, Maine courts have categorically rejected the application of promissory estoppel to promises otherwise unenforceable under the Statute. See Stearns v. Emery-Waterhouse Co., 596 A.2d 72, 74-75 (Me. 1991) ("Although section 139 of the Restatement may promote justice in other situations, in the employment context it contravenes the policy of the Statute to prevent fraud.").

We have not found a Maine case addressing this question in the specific context of this case, a sale of goods over five hundred dollars. Nevertheless, we think the court's discussion in Chapman is sufficiently thorough for us to anticipate how the state court would proceed. See Noonan v. Staples, 556 F.3d 20, 30 (1st Cir. 2009) ("Although we recognize that in exercising our diversity jurisdiction we must tread lightly in offering interpretations of state law where controlling precedent is scarce, we are also obliged to provide our 'best guess' as to open questions of state law when necessary.") (citation omitted).

In Chapman, the court invoked the "general equitable principle that since it is the purpose of the Statute of Frauds to prevent fraud, that Statute cannot be permitted to be itself an instrument of fraud." 381 A.2d at 1128. It also expressly adopted

-24-

Comment f to Section 178 of the Restatement, which explains that promissory estoppel may apply to a promise that is unenforceable under the Statute "if the statute would otherwise operate to defraud."  Id. at 1129 (internal quotation mark omitted).  The court clarified that its adoption of the standard in Comment f does not require that the promisor "made the promise with an actual subjective intention to relinquish the right to assert the Statute of Frauds or with an actual intention otherwise to deceive."  Id. Rather, the criterion is "whether all the particular circumstances . . . show, objectively, that a fraud, or a substantial injustice tantamount to a fraud, would be perpetrated  upon the promisee were the promisor allowed to assert the Statute of Frauds as a bar." Id.

Although the facts of Chapman are not analogous to this case,[3] the court spoke in terms of general principle.  It appears

---

[3] In Chapman, the defendants (a husband and wife) invoked the Statute of Frauds as a defense against the enforcement of a contract for a sale of real estate that they had not signed.  381 A.2d at 1128.  The wife, however, had made a "separate ancillary promise . . . that she and her husband would sign, and return, the document." Id. at 1126. The issue facing the court was whether the separate promise to sign the document was enforceable under promissory estoppel.  The court noted that the promise to sign was "not itself within the textual language of the Statute of Frauds," but is nevertheless "deemed to be within the penumbra of the Statute's policy and thus becomes unenforceable like the underlying agreement to which it relates." Id. at 1128.  Thus, the court drew a distinction between the "penumbral policy" and the "actual terms" of the Statute, id. at 1129, and there is a strong argument that it would prohibit the use of promissory estoppel outright when, as in the case before us, the actual terms of the Statute apply.  See Stearns, 596 A.2d at 74 (explaining that "although we invoked the

to seek a middle course between an outright bar on the use of promissory estoppel on one hand and the wholesale use of the doctrine to evade the Statute on the other. Thus, it adopts a useful limiting principle, consistent with the purpose of the Statute, that allows courts to apply promissory estoppel when "it would be grossly unjust and, therefore, tantamount to a fraud on the plaintiffs to allow [a] defendant to assert the Statute of Frauds." Id. at 1129.

Of course, it is entirely possible that the Maine courts would bar the use of promissory estoppel claims entirely for the sale of goods, just as they did in the employment context in Stearns. See supra n.4. But whether we follow Stearns or Chapman, Packgen's claim fails. Under Stearns, the claim would be categorically barred, and there is no evidence from which a jury could find that Packgen has met the standard set forth in Chapman. There is nothing in the record, such as evidence of deliberate deception or bad faith, revealing "a substantial injustice tantamount to a fraud." See Chapman, 381 A.2d at 1129. Thus, the

---

rubric of promissory estoppel, our decision in Chapman actually applied an equitable estoppel and extended it only to an ancillary promise to make a writing") (emphasis added); Jolovitz v. City of Waterville, No. Civ.A. AP-01-82, 2003 WL 22100663, at *2 (Super. Ct. Me. Aug. 26, 2003) ("The agreement [in Chapman] was not the sales contract itself, which would bump more squarely into the Statute of Frauds considerations."). As we explain, Packgen's claim fails whether we follow the standard set forth in Chapman or bar the claim outright as the court did in the employment context in Stearns. Therefore, we can leave that question for the Maine courts to settle.

district court correctly concluded that the promissory estoppel claim fails as a matter of law.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's ruling.