ZENILTON O. LEMOS *vs.* ELECTROLUX NORTH AMERICA, INC., & another.[1]

No. 09-P-943.

Suffolk. June 4, 2010. - December 2, 2010.

Present: GREEN, DREBEN, & MILKEY, JJ.

*Consumer Protection Act,* Insurance, Availability of remedy. *Insurance,* Self-insurer.

This court concluded that a captive insurer was engaged in the business of insurance for the purposes of G. L. c. 176D, § 3(9), where the captive insurer, which issued documents that had all the indicia of insurance policies, had a distinct corporate identity that was separate from that of its parent corporation; where the parent corporation realized financial benefits from having a captive insurer rather than being a self-insurer; and where, in view of the legislative silence on the subject of the applicability of c. 176D to captive insurers, there was no reason to except the captive insurer from the provisions of the general insurance law. [380-384]

A manufacturing corporation with a captive insurer was not engaged in the business of insurance and was therefore not subject to the provisions of G. L. c. 176D. [384]

CIVIL ACTION commenced in the Superior Court Department on June 9, 2006.

The case was heard by *John C. Cratsley,* J., on motions for summary judgment.

*Paul A. Gargano (Aaron Weissman* with him) for the plaintiff.

*Samuel M. Furgang* for the defendants.

DREBEN, J. As a result of a defective lawnmower manufactured by the defendant Electrolux North America, Inc. (Electrolux), the plaintiff suffered severe injuries in 2001. In 2005, he obtained a jury verdict against Electrolux of $550,000 in the Federal District Court, and thereafter brought this action against Electrolux and

---

[1]Equinox Insurance Company.

its captive insurer,[2] Equinox Insurance Company (Equinox). He claimed that both corporations engaged in claim settlement practices in violation of G. L. c. 176D, § 3, and G. L. c. 93A.[3] On cross motions for summary judgment, a judge of the Superior Court, citing *Poznik* v. *Massachusetts Med. Professional Ins. Assn.*, 417 Mass. 48 (1994), and *Morrison* v. *Toys "R" Us, Inc.*, 441 Mass. 451, 454 n.1 (2004), determined that neither company was engaged in the business of insurance. He allowed the defendants' motions and denied the plaintiff's motion.

1. *Facts and provisions of policy issued by Equinox.* At the relevant time of the negotiations concerning the plaintiff's claim, Electrolux, the manufacturer of the lawnmower involved in the plaintiff's accident, was the parent and sole shareholder of several wholly-owned subsidiaries, including Equinox. Organized as a captive insurance company in Vermont, see note 2, *supra,* Equinox issued policy number G.L.040101-03[4] insuring "Electrolux North America, Inc. (as per Broad Named Insured Endorsement)" for the policy period April 1, 2001 to April 1, 2004. The annual premium was $16,600,000[5] for "Commercial General Liability Coverage Part." The limits of insurance were as follows:

"General Aggregate Limit (Other than Products — Completed Operations) $15,000,000

"Products — Completed Operations Aggregate Limit $15,000,000

"Personal and Advertising Injury Limit $2,000,000

"Each Occurrence Limit $2,000,000

"Fire Damage Limit — Any One Fire $2,000,000

---

[2]Captive insurance companies are separate insurance companies formed to bear the risks of the parent company. Equinox bore the risks of the parent, its subsidiaries, and to some extent its vendors and others. Premiums paid to a captive may be tax-deductible, and a captive has the potential to produce lower insurance costs for the parent than coverage purchased from a commercial insurer. See 1 New Appleman on Insurance § 1-1.09[3], at 1-95 (2010).

[3]The G. L. c. 93A claim is not an issue in this appeal.

[4]Including the endorsements, the policy contained approximately 140 pages.

[5]Some modifications of the premium were made in several of the numerous endorsements.

"Medical Expense Limit — Any One Person $5,000."

The policy insured (with the addition of endorsement no. 1):

> "Electrolux North America, Inc. and AB Electrolux and all their affiliated, subsidiary, controlled or associated companies, corporations or other legal entities now existing or subsequently formed (including subsidiaries thereof)."

In addition "Who is an insured" included "executive officers and directors" when acting in "your behalf,"[6] and the policy was also amended to include any vendor "with respect to the distribution or sale in the regular course of the vendor's business of [Electrolux] products" (with certain exceptions). The policy had some eighty-five endorsements adding owners, lessees, or contractors as insured with respect to liability arising out of " 'your work' for that insured by or for you."[7]

Coverages included "Coverage A. Bodily injury and property damage liability"; "Coverage B. Personal and advertising injury liability"; "Coverage C. Medical payments"; and "Supplementary payments — coverages A and B."[8]

With respect to the coverage for bodily injury and property damage liability the policy provided in relevant part: "We will indemnify the insured for those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is

---

[6]In describing some of the policy provisions in this opinion, we follow at times the policy's language in referring to the insured as "you" or "your."

[7]Equinox also issued a "casualty indemnity policy" to indemnify "Electrolux North America, Inc. (as per Broad Named Insured Endorsement) . . . for all sums which the insured shall be obligated to pay by reason of the deductible provisions of Kemper Insurance Companies ('the Kemper Policies')" for the period April 1, 2001 to April 1, 2002. The limit of liability was $1,000,000 per claim plus allocated loss expenses. The premium was $4,188,842. The Kemper Policies were workers' compensation and employers' liability insurance and business auto policies. In addition the record includes the following policies issued by Equinox for additional premiums: a "marine open cargo policy," a "property all risk policy," a "specific excess workers compensation policy," and a "commercial excess occurrence policy" with numerous endorsements.

[8]Other endorsements added coverage for risks such as employee benefits liability insurance, employed lawyer's professional liability, and operations of the Design & Manufacturing Corporation.

covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS — COVERAGES A AND B. . . .[9] You have the right and duty to defend any 'suit' seeking those damages. But . . . we may investigate and settle any claim or 'suit' at our discretion."

Coverage C provides for medical payments. It contains a clause specifying that "[t]he injured person submit[ ] to examination, at our expense, by physician of our choice as often as we reasonably require."[10]

The policy sets forth "Duties in The Event of Occurrence, Claim or Suit." Those provisions include the requirement that "you must notify your Director of Risk Management as soon as practicable and arrange for the defense of such claim or 'suit.' " That section also provides that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." The policy thus does not explicitly give the insured (Electrolux) the right unilaterally to settle claims.

Gene Heskett, the director of risk management at Electrolux and the president of Equinox, claimed in an affidavit that Equinox has no employees, only a board of directors, and that since it has

---

[9]The provision for supplementary payments — coverages A and B provides in part:

"We will indemnify the insured with respect to any claim or 'suit':

"1. All reasonable expenses incurred by the insured in the investigation or defense of the claim or 'suit,' including actual loss of earnings up to $100 a day because of time off from work.

". . .

"5. Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer."

[10]Although the section preceding this clause speaks of indemnifying the insured for medical expenses on premises owned or rented by the insured, on ways next to the premises or "[b]ecause of your operations," it would seem that the provision also applies under coverage A — bodily injury and property damage liability, which provides that "[d]amages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at an[y] time from the 'bodily injury.' "

never had any employees, no Equinox personnel played a role in the investigation or negotiation of the plaintiff's underlying claim. He averred that Equinox had no involvement in the investigation, negotiation or litigation of a claim. Its role is purely that of a funding vehicle for the reimbursement of Electrolux for claims that are paid by Electrolux.

As revealed in the minutes of a meeting of the board of directors of Equinox held on November 30, 2001, Heskett reported to the board that "over the last 2 years results have been moving from break-even to profitability" and that "year-end income will be less than we made last year, but still substantially profitable."[11] In answers to interrogatories addressed to Equinox, Heskett stated that premiums to be paid to Equinox are calculated on the basis of loss experience to which are added anticipated costs for administration, data processing, taxes, and other related expenses for the upcoming policy year.

2. *Discussion.* In reviewing the allowance of the defendants' motion for summary judgment, we examine de novo the judge's legal conclusion that Electrolux and Equinox were not engaged in the business of insurance. See *Maffei* v. *Roman Catholic Archbishop of Boston*, 449 Mass. 235, 243 (2007), cert. denied, 552 U.S. 1099 (2008).

a. *Equinox.* That company is registered as a captive insurance company in Vermont. The record shows that it is a for-profit entity, calculates the premiums it charges based on loss experience and costs, calls itself an insurance company, and has issued a policy that states it provides commercial general liability and other coverage. As a captive company, it provides Electrolux certain advantages over a self-insurer, see note 2, *supra.* See also note 11, *supra.* Equinox does not claim that the policy provisions are unlike those of other insurers.

What it claims is that since Equinox is a captive company, Electrolux is in effect a self-insurer, and therefore Equinox is not engaged in the business of insurance. Equinox argues that it falls within the ambit of *Morrison* v. *Toys "R" Us, Inc.*, 441 Mass. 451 (2004) (*Morrison*). It also claims that since it has no

---

[11]Heskett also told the board that costs for workers' compensation no longer favor self-insurance and that he was looking to bring some of those risks into the captive program.

employees and merely reimburses Electrolux, it did not engage in any unfair practices. We reject both arguments. Toys "R" Us (Toys) was a self-insurer, that is, it did not have insurance against certain losses. *Id.* at 456. Toys had no contract with any other entity. As pointed out in *Morrison*, the prohibitions set forth in G. L. c. 176D, § 3(9), were "designed to remedy a host of possible violations in the insurance industry." *Id.* at 454, quoting from *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 562 (2001). Those concerns, the *Morrison* court held, "cannot legitimately be extended to a self-insurer such as Toys, which had no contractual obligation to settle the plaintiff's claim and is not otherwise regulated by the Commonwealth for insurance activities." *Id.* at 455. The court also noted that the plaintiff "appears to concede that Toys is not 'engaged in the business of insurance' and, thus, not directly subject to G. L. c. 176D's regulatory scheme." *Id.* at 453.

Here, in contrast, Equinox is a separate corporation regulated by the State of its incorporation, and is engaged in the business of issuing insurance policies. One of the "bedrock principles of corporate common law" is that "corporations — notwithstanding relationships between or among them — ordinarily are regarded as separate and distinct entities. See, e.g., *Attorney Gen.* v. *M.C. K., Inc.*, 432 Mass. 546, 555 (2000); *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968)." *Scott* v. *NG US 1, Inc.*, 450 Mass. 760, 766 (2008).

The case of *Poznik* v. *Massachusetts Med. Professional Ins. Assn.*, 417 Mass. at 52, is of no assistance to Equinox. Not only has that case been weakened by the 1996 amendment to G. L. c. 176D, § 1(*a*), St. 1996, c. 313, see *Wheatley* v. *Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 608 (2010), but unlike the entity in that case, which was government-created and controlled, here Equinox was formed for business reasons, see *Barrett* v. *Massachusetts Insurers Insolvency Fund*, 412 Mass. 774, 775-776 (1992), and has, as we have indicated, provided economic advantages to Electrolux, its parent.

In view of its separate corporate identity and the financial benefits to Electrolux of having a captive insurer rather than being a self-insurer, i.e., having no insurance, we consider Equinox, a distinct corporation issuing documents that have all the indicia

of insurance policies, to be in the business of insurance. *Morrison* is not apposite.

More pertinent is *Miller* v. *Risk Mgt. Foundation of the Harvard Med. Insts., Inc.*, 36 Mass. App. Ct. 411 (1994) (*Miller*). The facts in that case were as follows: Beth Israel Hospital and other Harvard-affiliated hospitals and certain of their respective staffs were provided with medical malpractice insurance by the Controlled Risk Insurance Company (CRICO), an entity organized in the Cayman Islands. Risk Management, incorporated in Massachusetts as a charitable corporation, investigated claims asserted against the hospitals, negotiated settlements, and appointed counsel when the claims proceeded to trial. As characterized in *Miller*, it sought "to control or minimize the ultimate exposure of CRICO and thus of the hospitals." *Id.* at 416. Both CRICO and Risk Management were owned by Harvard University and the affiliated hospitals, *ibid.*; thus CRICO was a captive insurer. When Miller brought suit against Risk Management for failure to effectuate a fair settlement of the Millers' claims, Risk Management argued that because it was not an insurer, no direct action could be brought against it under G. L. c. 93A, which authorizes an action against an insurance company that violates G. L. c. 176D.[12]

Justice Kaplan, writing for the panel, held that "Risk Management, as claims negotiator and potential settler, has been interposed between the insurer CRICO and the claimant, and nothing seems more appropriate than to apply to it the standards of fair dealing expressed in c. 176D, § 3(9)." *Id.* at 418. The Supreme Judicial Court in *Morrison*, 441 Mass. at 455, considered this a "proper[ ]" conclusion. Implicit in the *Miller* case, which applied the standards of c. 176D to Risk Management, is that had CRICO itself been a defendant, c. 176D would certainly have applied to it. While the court was not specifically directed to the argument made here that captive insurers should be treated as self-insurers, both this court and the Supreme Judicial Court were clearly aware that CRICO was a captive insurer and Risk Management was a wholly-owned subsidiary.

We note that the matter of the applicability of unfair trade practices to captive insurers has often been addressed by State

---

[12]The trial judge found that Risk Management was not in the business of insurance. The Millers did not contest this ruling in their appeal.

statutes.[13] Massachusetts and a number of other States do not have a special captive insurer act. The only places captive insurance companies are discussed in the Massachusetts insurance law are in the "Business Transacted with Broker-Controlled Insurer Act," G. L. c. 175, § 174F, inserted by St. 1993, c. 47, and in the "pollution liability reinsurance corporation" statute, G. L. c. 175G, § 4, inserted by St. 1987, c. 650, § 2. The following definition appears in G. L. c. 175, § 174G: "All captive insurers, for the purposes of these sections one hundred and seventy-four F to one hundred and seventy-four K, inclusive, captive insurers are insurance companies owned by another organization whose exclusive purpose is to insure risks of the parent organization and affiliated companies or, in the case of groups and associations, insurance organizations, owned by the insureds, whose exclusive purpose is to insure risks to member organizations and group members and their affiliates."[14]

---

[13]Numerous State Legislatures have passed acts specifically dealing with captive insurance companies. Some of them provide that only the provisions in the special acts apply to these companies (thus in these States captives are usually not subject to unfair practices provisions applicable to other insurers). See, e.g., Ala. Code § 27-31B-18 (LexisNexis 2007); Ark. Code Ann. § 23-63-1616 (2001 & Supp. 2009); Conn. Gen. Stat. § 38a-91oo (2009); Del. Code Ann. tit. 18, § 6916 (1999 & Supp. 2008); Hawaii Rev. Stat. § 431:19-115 (2008); Me. Rev. Stat. Ann. tit. 24A, § 6719 (West 2000); Mich. Comp. Laws Ann. § 500.4625(1) (West Supp. 2010); Neb. Rev. Stat. Ann. § 44-8218 (LexisNexis 2010); R.I. Gen. Laws § 27-43-11 (2008); S.C. Code Ann. § 38-90-160 (Supp. 2009); S.D. Codified Laws § 58-46-26 (2004); Utah Code Ann. § 31A-37-103 (2005 & Supp. 2010); Vt. Stat. Ann. tit. 8, § 6016 (Supp. 2009).

Other States specifically apply the unfair practices provisions to captive insurers. See, e.g., Ariz. Rev. Stat. §§ 20-461, 20-1098.15 (2002 & 2010); Col. Rev. Stat. §§ 10-3-1101, 10-6-130 (2010); Fla. Stat. §§ 626.954(1)(i), 628.909 (2010) (except for industrial insured captive insurers); 215 Ill. Comp. Stat. Ann. 5/123C-18, 5/123C-20, 5/321 to 5/434 (West 2000); Mo. Ann. Stat. §§ 375.932(3), 375.936, 379.1330 (West 2002 & Supp. 2010); Mont. Code Ann. §§ 33-18-201, 33-28-207 (2009); Tenn. Code Ann. §§ 56-8-105, 56-13-111 (2008 & Supp. 2010); Va. Code Ann. § 38.2-1109 (LexisNexis 2007); W. Va. Code Ann. §§ 33-11-6, 33-31-6(g) (LexisNexis 2006).

Others are not so specific, stating that provisions inconsistent with the captive act shall not apply. See, e.g., Ga. Code Ann. § 33-41-24 (2005). Still others deal with captives in various other ways. See Kan. Stat. §§ 40-2401 to -2442, -4315 (2000); Okla. Stat. tit. 36, §§ 6470.2, 6470.10 (2009); N.Y. Ins. Law §§ 327, 7001 (McKinney 2009).

We assume, and no party has argued otherwise, that G. L. c. 176D applies to all insurers doing business in this State irrespective of the State of incorporation.

[14]Captive insurers are not subject to G. L. c. 175, § 174F.

The insurance industry is subject to extensive legislative provisions. In view of the legislative silence on the subject of the applicability of c. 176D to captive insurers, we see no reason to except Equinox from the provisions of the general insurance law. If the Legislature considers they should be treated differently, it may, of course, so provide. Since we hold that Equinox is engaged in the business of insurance, it is subject to the provisions of G. L. c. 176D, § 3(9).

Equinox also argues that it did not participate in the defense or settlement of the underlying lawsuit and therefore did not perform any actions that could constitute unfair settlement practices. In view of its extensive power to control settlements — "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent" — we question Equinox's attempt to escape liability on this ground. Nor do we think that Equinox, by interposing what appears to be its agent, in this case its parent, between the claimant and itself can evade liability. As pointed out in *Morrison*, 441 Mass. at 455-456, "The significance of the holding of the Appeals Court in the *Miller* case is that an insurance company cannot evade its statutory duties imposed by G. L. c. 176D by delegating its work." In any event, the motion judge did not reach these questions, and they may be informed by additional facts. Equinox's argument that the investigation of the claim was reasonable and did not violate c. 176D is a disputed matter and hence is not subject to summary judgment. Accordingly, the judgment in favor of Equinox is reversed, and the matter is remanded to the Superior Court for further proceedings.

b. *Electrolux.* Although under the insurance policy Electrolux has a duty to defend (and perhaps, a duty to settle, a matter not clear under the policy), under the *Morrison* decision, Electrolux is not in the business of insurance. It is therefore not subject to c. 176D. Accordingly, judgment in its favor is affirmed.

To summarize, the judgment in favor of Equinox is reversed, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion. The judgment in favor of Electrolux is affirmed.

*So ordered.*