# United States Court of Appeals
## For the First Circuit

No. 15-1437

WARREN BINGHAM, as Executor of the Estate of Marion Bingham,

Plaintiff, Appellant,

v.

SUPERVALU, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Lynch, Stahl, and Kayatta,
Circuit Judges.

Joshua N. Garick, with whom Law Offices of Joshua N. Garick, P.C., was on brief, for appellant.
Wesley S. Chused, with whom Preti Flaherty Beliveau & Pachios LLP, was on brief, for appellee.

November 13, 2015

**STAHL**, **Circuit Judge**. Massachusetts law prohibits those "in the business of insurance" from employing "unfair methods of competition and unfair or deceptive acts or practices," which include "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f) ("Chapter 176D"). This appeal requires us to consider what it means to be "in the business of insurance."

The Appellant, Warren Bingham, proceeding in his capacity as the executor of the estate of Marion Bingham (the "Estate"), brought suit alleging that the Appellee, Supervalu, Inc., acted as an insurer of one of its subsidiaries, and violated Chapter 176D by failing to promptly, fairly, and equitably effectuate the settlement of prior litigation between the subsidiary and the Estate. The district court found that Supervalu was not in the business of insurance and, on this basis, entered summary judgment in Supervalu's favor. The Estate appeals. Finding no error, we AFFIRM.

## I. Facts and Background

### A. The Prior Litigation

In January 2006, Marion Bingham was shopping at a Shaw's Supermarket in East Boston, Massachusetts when she was struck by a motorized cart. Ms. Bingham suffered a laceration to her right heel in the area of her Achilles' tendon. At the time, Ms. Bingham

was in her early-eighties, and the incident seems to have precipitated a rapid decline in her health. Ms. Bingham passed away approximately eight months later in September 2006.

Before she died, Ms. Bingham brought a negligence action against Shaw's in Massachusetts state court. Later, after her death, Ms. Bingham's nephew, Warren Bingham, was appointed as the executor of the Estate, and was substituted as the plaintiff in the suit against Shaw's.

At the time of the January 2006 incident, Shaw's was a subsidiary of Albertson's, Inc. On June 2, 2006, however, Albertson's was acquired by Supervalu. Thus, when Ms. Bingham filed her lawsuit against Shaw's at the end of June 2006, Shaw's was a subsidiary of Supervalu and, pursuant to the manner in which Supervalu structured its relationship with its direct and indirect corporate subsidiaries, Supervalu had the authority to negotiate and settle claims on behalf of Shaw's.

Including Shaw's, Supervalu owned some 228 distinct subsidiaries. Supervalu maintained a centralized risk management system whereby it negotiated and resolved claims made against its subsidiaries that were not otherwise covered by insurance.[1]

---

[1] At all relevant times, Shaw's was covered by general liability insurance policies taken out by Albertson's (and transferred to Supervalu in the acquisition), but the policies were subject to a self-insured retention of $2,000,000. This meant that Shaw's was effectively self-insured for all claims below $2,000,000. See Self-Insured Retention, Black's Law Dictionary

Supervalu employed claims adjusters to perform these functions, and once a self-insured claim was settled, Supervalu would issue payment from a central account on behalf of the subsidiary against which the claim was made. Supervalu did not issue insurance policies to its subsidiaries. However, in order to minimize its total costs and exposure, Supervalu opted to centralize the self-insured claims administration process.

In July 2008, in the liability action, a judge of the Massachusetts Superior Court entered judgment against Shaw's pursuant to Massachusetts Rule of Civil Procedure 33(a), which permits the entry of judgment against a party failing to timely respond to interrogatories. See Mass. R. Civ. P. 33(a). Approximately a year later, in June 2009, the Superior Court awarded damages to the Estate in the amount of $300,000, plus post-judgment interest.

Rather than pay the judgment, Supervalu filed an appeal to the Appeals Court of Massachusetts, which summarily affirmed the Superior Court's damages award. See Bingham v. Shaw's Supermarkets, Inc., 936 N.E.2d 452 (Mass. App. Ct. 2010) (unpublished). Then, Supervalu threatened to seek further appellate review in the Massachusetts Supreme Judicial Court (the

---

(10th ed. 2014) (defining a self-insured retention as "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usu[ally] must be paid before the insurer will pay benefits").

"SJC").  Rather than risk prolonging the litigation, the Estate accepted a $475,000 settlement offer, which represented a figure slightly below the sum of the original award, plus the post-judgment interest that had accrued to that date.

The Estate contends that Supervalu's decisions to appeal to the Appeals Court of Massachusetts, and then to threaten a further appeal to the SJC, were undertaken contrary to the advice of counsel that, in each instance, an appeal was unlikely to succeed.  The Estate argues that Supervalu's sole motive was to protract the litigation in the hopes of achieving a reduced settlement.  Ultimately, Supervalu made payment to the Estate on December 8, 2010.

B.   The Proceedings Below

All was quiet until April 2013, when the attorney who had represented the Estate in the underlying state court proceedings sent a demand letter to Shaw's and Supervalu asserting that Supervalu had acted as Shaw's insurer and had violated Chapter 176D and Mass. Gen. Laws ch. 93A ("Chapter 93A") by failing to promptly and fairly resolve the Estate's claim against Shaw's.[2] The letter demanded payment of just over $1,000,000.  Supervalu declined to pay.

_____

[2] Chapter 93A provides an express cause of action for persons aggrieved by a violation of Chapter 176D.  See Mass. Gen. Laws ch. 93A, § 9(1).

- 5 -

The Estate brought suit against Supervalu in Massachusetts Superior Court, asserting claims for violation of Chapter 176D and Chapter 93A based on Supervalu's "willful" and "frivolous" delay in resolving the underlying litigation between Shaw's and the Estate. Supervalu removed the action to federal court and moved for summary judgment, arguing solely that it was not in the business of insurance, and therefore was not subject to regulation under Chapter 176D.

Pursuant to a report and recommendation issued by a magistrate judge, the district court concluded that Supervalu was not in the business of insurance. Relying heavily on the SJC's holding in Morrison v. Toys "R" Us, Inc., Mass., 806 N.E.2d 388 (Mass. 2004), the district court reasoned that Supervalu did not act as an insurer because it did not sell insurance policies for profit and was not contractually obligated to settle claims made against Shaw's or its other subsidiaries. Rather, the district court found that Supervalu operated a centralized risk management system to negotiate and settle claims made against any of its subsidiaries that were below the limits of its applicable insurance coverage. Thus, for these claims, as a "self-insurer," Supervalu was not "in the business of insurance" as that term is contemplated in Chapter 176D and in Morrison. On this rationale, the district court entered summary judgment in Supervalu's favor, prompting the instant appeal.

## II. Standard of Review

We review orders for summary judgment de novo, assessing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. Packgen v. BP Expl. & Prod., Inc., 754 F.3d 61, 66 (1st Cir. 2014). The entry of summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(a)).

## III. Discussion

Although a litigant is typically free to mount a vigorous defense, and is under no obligation to make a settlement offer or to otherwise promptly resolve a dispute, see Mass. Const. art. XV, Chapter 176D imposes a statutory obligation on those "in the business of insurance" to "prompt[ly], fair[ly] and equitabl[y]" settle claims in which liability has become reasonably clear. Mass. Gen. Laws ch. 176D, § 3(9)(f). Chapter 176D was "enacted to encourage settlement of insurance claims . . . and [to] discourage insurers from forcing claimants into unnecessary litigation to obtain relief." Hopkins v. Liberty Mut. Ins. Co., 750 N.E.2d 943, 952 (Mass. 2001) (quoting Clegg v. Butler, 676 N.E.2d 1134, 1139 (Mass. 1997)). "One obvious legislative concern was that entities that profit from selling insurance policies not abuse exclusive rights and duties to control litigation vested through those same policies." Morrison, 806 N.E.2d at 390.

- 7 -

The sole issue we must consider is whether Supervalu was in the business of insurance. The Estate proffers a series of arguments suggesting that it was.[3] First, the Estate contends that the district court erred in concluding, pursuant to the SJC's decision in Morrison, that Supervalu was a "self-insurer" exempt from regulation under Chapter 176D. Second, the Estate argues that Supervalu functions in a manner similar to both a "captive insurer" and a "third-party administrator," and thus should be deemed to be in the business of insurance. Third and finally, the Estate suggests that because one of Supervalu's many subsidiaries, Risk Planners, Inc. ("Risk Planners"), was an insurance agency, that Supervalu, as its parent company, was by definition engaged in the business of insurance. We consider each of these arguments in turn.

A.  The Morrison Exemption for Self-Insureds

In Morrison, the SJC considered the contours of Chapter 93A and Chapter 176D in the context of a suit brought by a Toys "R" Us ("Toys") patron who was injured while shopping at a Toys store. 806 N.E.2d at 388-89. After the Superior Court entered

---

[3] In her report and recommendation, the magistrate judge concluded that the Estate bore the burden of proof under Chapter 176D to demonstrate that Supervalu was engaged in the business of insurance. See Bingham v. Supervalu Inc., No. 13-11690-IT, 2015 U.S. Dist. LEXIS 42925, at *14 (D. Mass. Feb. 20, 2015). Because the Estate appears to concede the point, we assume -- without deciding -- that the magistrate judge's conclusion was correct.

- 8 -

summary judgment for Toys on grounds that it was not in the business of insurance, the Appeals Court of Massachusetts reversed. See Morrison v. Toys "R" Us, Inc., Mass., 797 N.E.2d 405 (Mass. App. Ct. 2003). On further appellate review, the SJC reinstated the judgment of the Superior Court, finding that Toys was indeed not in the business of insurance. Morrison, 806 N.E.2d at 388.

We rehearse the factual background as described by the SJC, augmenting where necessary with the Appeals Court's somewhat more robust account.[4] After she had been injured by a falling sign at a Toys location in Massachusetts, the plaintiff brought suit against Toys "R" Us, Inc., Massachusetts, a wholly-owned subsidiary of Toys, seeking damages of $250,000. Morrison I, 797 N.E.2d at 406-07. Toys had a policy whereby it handled claims of less than $1,000,000 made against itself or its subsidiaries through a central risk management department. Morrison, 806 N.E.2d at 389. Toys, through the risk management department, made the plaintiff a series of exceedingly low offers, all of which she rejected. Id. At trial, the jury returned a $1,200,000 verdict for the plaintiff based on her "significant" injuries.[5] Morrison I, 797 N.E.2d at 406-07.

_____

[4] We cite to the Appeals Court's decision as "Morrison I."

[5] This figure was later reduced by remittitur. Morrison I, 797 N.E.2d at 407.

- 9 -

The plaintiff then brought a separate suit alleging that Toys had violated Section 176D by failing to promptly, fairly, and equitably resolve her claim against the Toys subsidiary. Morrison, 806 N.E.2d at 389. In affirming the Superior Court's entry of summary judgment for Toys on grounds that it was not in the business of insurance, the SJC found that Toys was "self-insured," meaning that it "assum[ed] [its] own risk, instead of transferring it to a third-party insurer by means of purchasing insurance coverage." Id. at 390 n.1. Focusing on the fact that Toys administered, negotiated, and settled claims made only against itself, "or one of its subsidiaries," the SJC reasoned that Chapter 176D "cannot legitimately be extended to a self-insurer . . . which had no contractual obligation to settle the plaintiff's claim and is not otherwise regulated by the Commonwealth for insurance activities." Id. at 389, 391.

We find the Estate's attempts to distinguish Morrison unpersuasive because these attempts overlook critical factual parallels between the two cases. In Morrison, as here, the plaintiff brought suit against a subsidiary retailer responsible for injuries occurring on the retailer's premises. In both cases, the subsidiary's parent company undertook to resolve the claim directly with the claimant, rather than rely on insurance provided by a third party. Toys, as a matter of practice, attempted to negotiate and resolve claims for less than $1,000,000 made against

itself and its subsidiaries.  Supervalu had a similar practice whereby it negotiated and resolved uninsured claims made against its subsidiaries through a centralized risk management system. Then, in both cases, the plaintiff brought a subsequent suit alleging that the parent company was in the business of insurance.

The SJC has recognized that the hallmarks of companies engaged in the business of insurance include making "profit driven business decisions about premiums, commissions, marketing, reserves and settlement policies and practices," assuming the risk of losses suffered by third parties, Poznik v. Mass. Med. Prof'l Ins. Ass'n, 628 N.E.2d 1, 3 (Mass. 1994), and settling claims pursuant to a contractual obligation to do so, Morrison, 806 N.E.2d at 391.  As in Morrison, none of those factors are present here. Supervalu did not sell insurance policies to its subsidiaries; it handled claims only for itself and its subsidiaries and therefore did not assume risk on behalf of unaffiliated third parties; and, Supervalu was not under a contractual obligation to settle claims with the Estate or with any other claimant.

True, as the Estate notes, Supervalu spread risk among its subsidiaries and paid claims out of a central account, much like a typical insurer.  But this merely underscores the fact that Supervalu qualifies as self-insured because, like the parent company in Morrison, Supervalu opted to bear the full risk of loss stemming from uninsured claims made against itself and its

subsidiaries.  See id. at 390 n.1 ("The term 'self-insured' is a manner of referring to a decision not to be insured by a third party when one has the financial means . . . to satisfy claims or judgments imposing liability for wrongful conduct.").  For all of these reasons, we concur with the district court that Morrison is controlling and that Supervalu is properly characterized as a self-insurer exempt from regulation under Chapter 176D.

B.    Captive Insurers and Third-Party Administrators

The Estate next contends that Supervalu should fall within Chapter 176D's purview by virtue of functioning in a manner similar to a captive insurer and a third-party administrator.  We conclude that neither shoe fits.

Captive insurers are "insurance companies owned by another organization whose exclusive purpose is to insure risks of the parent organization and affiliated companies[.]"  Lemos v. Electrolux N. Am., Inc., 937 N.E.2d 984, 989 (Mass. App. Ct. 2010) (quoting Mass. Gen. Laws ch. 175, § 174G).  The Estate's suggestion that Supervalu is properly viewed as a captive insurer cannot survive a basic reading of this statutorily-prescribed definition.  As an initial matter, Supervalu was not owned by another organization; it was the parent company to Shaw's and its other subsidiaries, and there is no record support for the conclusion that Supervalu's purpose (let alone its exclusive purpose) was to insure its affiliates.  Furthermore, for reasons we have described,

- 12 -

Supervalu did not operate as an insurance company in that it did not issue insurance policies for profit and was not contractually obligated to settle claims. Cf. Lemos, 937 N.E.2d at 987-90 (finding that a captive insurer could not "evade its statutory duties imposed by [Chapter 176D]" where the captive insurer had, inter alia, issued insurance policies to its parent company in exchange for a premium and had the exclusive right to resolve claims on the parent company's behalf). Simply put, no reasonable reading of Lemos or Mass. Gen. Laws ch. 175 would support the conclusion that Supervalu should be regulated as a captive insurer.

The Estate next contends that Supervalu is in the business of insurance by virtue of functioning like a third-party administrator by resolving claims on behalf of its subsidiaries. In advancing this argument, Supervalu principally relies on Miller v. Risk Mgmt. Found. of Harvard Med. Insts., Inc., 632 N.E.2d 841 (Mass. App. Ct. 1994). There, the plaintiff brought a medical malpractice claim against a Harvard-affiliated hospital. Id. at 842-43. The hospital was insured by a Harvard-owned insurance company, and malpractice claims against the hospital were assessed and negotiated through a separate Harvard-owned risk management provider. Id. at 844. In a separate suit brought under Chapter 93A and Chapter 176D, the plaintiff alleged that the risk management provider had unlawfully stymied his attempts at settlement, despite obvious liability. Id. In concluding that

the risk management provider was liable under Chapter 93A, the Appeals Court of Massachusetts found that, "as claims negotiator and potential settler, [the risk management provider] has been interposed between the insurer [] and the claimant, and nothing seems more appropriate than to apply to it the standards of fair dealing expressed in [Chapter 176D]." Id. at 846.

The Estate's reliance on Miller cannot withstand scrutiny. For one thing, in the underlying litigation, Supervalu was not interposed between an insurer and the Estate; indeed, as we have said, Supervalu was self-insured for the first $2,000,000 of potential liability facing any one of its subsidiaries. See Morrison, 806 N.E.2d at 391 ("The significance of the holding of the Appeals Court in the Miller case is that an insurance company cannot evade its statutory duties imposed by [Chapter 176D] by delegating its work.").

What is more, unlike the risk management provider at issue in Miller, Supervalu did not purport to act on behalf of an insurer that had a contractual obligation to pay claims. Rather, Supervalu was under no duty to settle claims made against Shaw's or its other subsidiaries.[6] See id. ("The Miller decision simply

---

[6] The Estate points to record evidence which it suggests establishes that Supervalu may have acted as a claims administrator for one or more subsidiaries that it did not wholly own. We do not view this evidence as establishing a dispute of material fact regarding whether Supervalu was in the business of insurance because there is no evidence that Supervalu bore the risk of loss

- 14 -

cannot be read to impose an affirmative claim settlement duty on the risk management department of Toys, when none could be imposed on Toys itself."). In sum, we share the view of the district court that Supervalu did not function as a captive insurer, nor did it function as a third-party administrator, and thus it should not be regulated as such.

C.    Supervalu's Ownership of Risk Planners

Finally, the Estate contends that Supervalu was in the business of insurance by virtue of owning Risk Planners, an insurance agency. During the pendency of the underlying state court litigation, Risk Planners was one of Supervalu's subsidiaries.

It is undisputed that Risk Planners was wholly uninvolved in the litigation between the Estate and Shaw's. Risk Planners did not insure either Shaw's or Supervalu, and it had no role in adjusting, negotiating, or litigating the Estate's claim. Nevertheless, the Estate's argument is not entirely without merit. Take, for example, a hypothetical parent company that has a number of subsidiaries in different sectors, including one that operates an airline. By virtue of owning a subsidiary airline, no one could reasonably dispute that the parent company is, by some measure,

---

for these entities, that it adjusted claims on their behalf pursuant to a policy of insurance, or that it was obligated to settle claims made against these entities. See Morrison, 806 N.E.2d at 391; Poznik, 628 N.E.2d at 3.

"in the airline business."  So too, one might fairly conclude that Supervalu was "in the business of insurance" by virtue of owning an insurance agency.

It is an entirely different proposition, however, to suggest that a parent company is independently subject to all of the laws and regulations that govern the operation of its individual subsidiaries.  For example, it would defy logic to suggest that our hypothetical parent company is itself subject to aviation regulations, even though those regulations would plainly apply to its subsidiary airline.

What is more, the Estate's suggestion that Supervalu was in the business of insurance by virtue of owning an insurance agency that had nothing to do with the subject litigation contorts Chapter 176D's well-established policy underpinnings.  As we have said, Chapter 176D was enacted to curb abuses that might result from an insurer's exclusive right to control litigation stemming from policies that the insurer has sold for profit.  Morrison, 806 N.E.2d at 390.  Here, there is no such concern because Risk Planners neither sold relevant coverage, nor had any control over the litigation between Shaw's and the Estate.  Thus, Supervalu's ownership of Risk Planners does not support the conclusion that it was in the business of insurance for purposes of Chapter 176D.

## IV. Conclusion

We concur with the district court that Supervalu was not in the business of insurance, and thus we AFFIRM the entry of summary judgment in Supervalu's favor.[7]

---

[7] Prior to oral argument, the Estate filed a motion asking that we certify a series of questions to the SJC bearing on the scope of Chapter 176D. That motion was denied without prejudice by order dated August 21, 2015. Because the motion was not renewed, we need not consider it. And, in any event, we would decline to certify these issues to the SJC given the law's existing clarity. See Tarr v. Manchester Ins. Corp., 544 F.2d 14, 15 (1st Cir. 1976) (per curiam) ("The purpose of certification is to ascertain what the state law is, not, when the state court has already said what it is, to afford a party an opportunity to persuade the court to say something else.").